Powell v. Wells Fargo Mr. Miller, you have reserved two minutes before rebuttal, so that gives you eight minutes out of the gate. You may proceed. Good morning, Your Honor. May it please the Court. I'm Bradley Miller. I represent the USCW Benefit Plan, which, like many benefit plans, invested significantly in residential mortgages through instruments very familiar to you all, known as mortgage-backed securities. The issue here is whether those securitized assets, those securitized mortgages, were assets of the USCW plan so that the fiduciary duty applies. It does. The plans obviously did not invest, did not make a loan to the special purpose vehicle, the trust, that had no other assets besides the mortgage pool, that had no other income besides the proceeds of the mortgages. The special purpose vehicles were a mechanism, a vehicle, to invest in the mortgages. The plan invested in mortgages. Could I interrupt for a second? Yes, ma'am. My understanding is that each of those vehicles, can you hear me? I'm sorry, what? Can you hear me? Just barely. I'm sorry. Let's see if I can turn this up. Is that better? A little bit. My understanding is that each of those special purpose vehicles issued two types of certificates. Not each. There were three that issued one type and three that issued the other type. But there were notes that were characterized as indebtedness and certificates that evidenced a beneficial ownership. Correct. And so there were two different types of securities. Correct. That were available through those vehicles. And your client procured instruments characterized as debt that had fixed maturity dates and interest payments. Isn't that correct? There are a great many equity features. They did characterize the indenture trust. The indenture trusts were specifically designed to avoid the fiduciary duty. The circumstances were American Home, which was one of the largest and most disreputable subprime lenders of 20 years ago, originated the mortgages, sponsored the securitization, and serviced the securitized mortgages. They had an obvious self-interest in avoiding the fiduciary duty for their servicer and allowing their servicer to protect the sponsor and the other affiliates for the other functions. And they drew the documents to try to avoid the fiduciary duty. But the pension fund itself characterized these as debt securities. I'm sorry, what? Your Honor, the form 5500 is simply an administrative filing, an informational filing, to the Department of Labor for the Department of Labor to use. What is it called? The PBGC. It's generally a statement on the health of the firms. There's a category. But it seems like you want us to take the benefits of it being a debt instrument for tax purposes and for other things. But when it comes to basically having a claim under ERISA, you want to call it equity. There doesn't seem to be a problem with that. ERISA plans aren't subject to tax, so they had no tax to worry about. And the form 5500 filing was not intended to be informational for mortgage servicers. There was simply a list. Well, but it's a reflection that everybody, including the fund, construed these as debt securities. Not really, Your Honor. No. Well, they are debt securities. Were there other investors in addition to the fund? Were there other investors? Oh, yes. Oh, yes. So for them, they may have had tax ramifications. They may have, but they wouldn't have been affected by the plans 5500 filing. Well, the question really is were these, was this debt or was it equity? Let me ask you a different question. The other side argues that the servicing companies did not even know that the fund was investing until the lawsuit. So do you agree with that? And if that is true, how can they be expected to be fund fiduciaries if they don't even know that a fund has invested? The Department of Labor itself dealt with that issue in the significant participation provision. The fiduciary duty only applies if benefit plans have more than 25 percent. In the 20 percent, 25 percent of any class of securities in the entity, the department- Well, my first question was do you agree with their assertion that the servicing companies did not even know that the fund had invested until suit was brought? They certainly knew that there were very significant benefit plan investors. The investments were held by a custodial company. They may not have known that the UOCW plan in particular was an investor, but they certainly knew that benefit plans were very significant investors. It is just not credible to argue that they didn't know that there were benefit plan investors. They may not have known which ones, but they certainly knew there were benefit plan investors. We're not talking about mom-and-pop companies. We're talking about Ocwin, which is the nation's largest subprime servicer and the fourth largest servicer overall, and Wells Fargo, which is one of the nation's, one of the world's largest banks. The substantial participation provision was specifically so that parties handling assets would not be made, to use the defendant's term, the Ocwin's term, fiduciaries by surprise. But the fund's own asset manager thought that this was debt, right? Your Honor, this court— Is that an accurate statement? Well, no. It is not because there are two senses of that word, and this court made that point in policeman's annuity, that usually these instruments, mortgage-backed securities, are called debt securities because they are debt. You know, the underlying mortgages are debt. So they're just familiarly called, in terms evocative of debt. But it doesn't mean that there was a legal analysis. It doesn't mean that there was an analysis that it was debt of the special purpose vehicle. It means that there was— Well, it sort of seems to sort of walk, talk, and squawk like debt. I mean, it's fixed payments, regular intervals. I mean, this is not the way equity typically works. I'm sorry. And there are many other ways in which they are not. There are—debt and equity characteristics are really a function of corporate tax law. And there are a lot of cases that have set forth the various criteria because there's an obvious self-interest by the person who is controlling what it's called, to call it whatever is in their best interest. I think we all recognize that what they call it is not dispositive. So we have to look at what these things are and how they act. And they sure look like debt. How not? Well, this court in police disinuity said that there's a contingency. There's always a contingency because they depend—the only source of funds is the mortgages. So that's an investment. That's an equity interest in the mortgages. It also means that the only source of funding, the only source of payment, was from the performance of the mortgages. They are subordinate to all of the outside creditors of the corporation. All of the outside creditors of the corporation. That is an equity feature. They were the initial capital that was used to buy the mortgage pool. The initial capital, that is an equity feature. What was the upside return? I thought that they were getting regular interest payments and had a fixed maturity date looking just like a regular loan. Was there an upside profit kind of feature? No. Your Honor, no homeowner is going to pay more than they owe on their mortgage. But in the pool, maybe the fact that they were pooled. Because you're talking about it as having equity features, and that's how I think of equity, is having a variability to it and an upside. No one had an upside. There was none here, is that right? These were fixed income features, so no one had an upside. The investments that Ackman says were equity features had no upside potential. They were just the least senior tranches. And in the case of the residual interest in the remix, there was really nothing at all. And under the planned assets rule, they were held in trust. And the Department of Labor said very clearly, if it's held in trust, it is an equity interest, and it is subject to the underlying assets or assets of the benefit plan investors. There is a long list. There are several cases. We cited a couple. There are a couple more that are very widely cited, including by this court and TIFD. There's a state of Mixon, which gives a list of features, many of which are about half and half. Again, most of the cases are about businesses that are run for a profit. These are fixed income investors, fixed income investments. But Court of Mixon is 464 F. Second, three, six, three, nine, four. Nineteen seventy two case for the Fifth Circuit. A tax court decision. Hambushan v. C.I.R., which was cited by this court and TIFD. And it is forty seven tax court. Ninety. The list of features is at page ninety nine. And this is not a balancing test. I mean, this court said in TIFD that for purposes of determining whether it's tax or equity, whether it's equity or debt for tax purposes, there's a balancing of a lot of different features. The Finn Hay case said is either kaleidoscopic circumstances and is really is it closer to one or to the other? This is not that test. This is whether there is any substantial equity feature. The court intended to make it very a very narrow exception to the plant assets rule to the to the look through rule that. That that there were no substantial equity features there. But every every list of debt equity features list in capitalization. How can how can anyone look at these these instruments and not say these were very thinly capitalized? Your clients who had a fiduciary obligation to the fund made the investment. Well, it's not if it's not just about the fact that they could lose money, although a lot of a whole lot of pension plans did that equity feature goes to whether there's tax avoidance. Because if if if an entity is saying we're paying interest when it's really profits, that's tax avoidance. And that's one of the reasons the court that's perhaps the principal reason the court has made thin capitalization and equity feature. There's thin capitalization that was subordinate to all the general creditors of the corporation. Entirely payable from the performance of the mortgages. Those that were the initial assets that were that bought the mortgage pool. All of those are widely recognized as equity features. And the the the plan says any substantial equity feature. All right. We've got a couple of minutes for rebuttal, but I want to hear from the adversaries. So, Mr. Roth, you're going to be going first for seven minutes. Is that correct? May please the court. Yakov Roth on behalf of Wells Fargo. I'm going to be addressing the plan assets issue. And then counsel for awkward is going to take a few minutes to address the fiduciary status and knowledge alternative ground for affirmance. With respect to the plan assets issue, the under the deal, well, regulation that governs this question, the threshold determination that has to be made is whether the instrument is debt or equity. If it is debt, we don't look through and pretend that the underlying assets actually belong to the investor plan. And that debt equity dichotomy is a pretty familiar one in the law. It comes up a lot in tax disputes. This case has applied these tests for almost 100 years. It's a case by case and fact dependent framework. And the district court applied that framework. And I'd like to focus on three reasons why the district court correctly determined that these were debt and debt instruments without substantial equity features. The first is I think this one is undisputed that they are treated as debt for tax purposes. So we're starting from the premise that at least under the tax code, these are debt. Now, counsel suggested that the fund doesn't really care about the tax issues because the fund doesn't pay the tax. That's not quite right. The tax consequences are at the entity level. They're at the trust level. So if the if this were not debt, they wouldn't be getting the same distributions coming in. Tax would be coming off the top. The second point, just economically, these instruments, these securities bear all the typical features of debt. Of course, fixed interest rates, fixed maturity dates, seniority to both the equity tier and multiple other tiers of debt. I heard Mr. Miller say multiple times that they're subordinate to all other creditors. And I think you guys are talking past each other there. But my understanding is that they are senior to virtually every other investor. That's correct, Your Honor. I believe what counsel meant was that the expenses associated with the mortgages. So like the real estate appraiser who comes out and charges two hundred fifty dollars, that money goes out first before the investors. But as to the investors, the debt is senior to the equity. And the particular debt instruments that the fund acquired were senior to many classes of and tranches of debt that were that were below. And those are traditional features of debt. And there were also other protections to assure the investors that there was a reasonable expectation of repayment. And that includes not only the over collateralization, but also importantly, the excess interest. So the mortgage borrowers are paying a certain interest rate and then the notes are paying out at a lower interest rate. So there's an expectation that more money is going to be coming in. That gives them a cushion to assure that they are do have that reasonable expectation of repayment. And then the third point is, as Judge Sullivan noted, everyone really thought these were debt. The ratings agencies thought they were debt because they rated them. They don't rate equity securities. The bank, the fund's bank that held them classified them as debt. The investment manager that acquired them was only permitted to acquire them if they were debt. It was a fixed income manager. And then, of course, the fund itself and the fifty five hundreds characterized them as debt. Now, again, as Judge Sullivan said, I'm not arguing that that is dispositive in itself, but I think it is telling about the intent of the parties, which is a factor in the debt equity test, that this court has looked to as far back as 1935 in the OPP Holdings case with Judge Learned Hand on the panel, said we care about the label because we do care about what the parties intended the relationship between them to look like. Judge Carney, you asked about upside potential, and counsel said, well, nobody had an upside potential. That's not quite right either because, as I mentioned, because of the excess interest and the over-collateralization, there is some upside potential. They're expecting some amount of default, and that's baked in. But if it turns out to be better than expected, the equity owners get the benefit of that, and that was a different class of investment. For the indenture trusts, it's the certificate holders who would receive that. For the remit trusts, it was the residual interests that would receive that, as defined by the tax code. Now, with respect to, so what did counsel say about what are the substantial equity features? Here, the one I heard this morning was he said, look, the repayment was coming from the mortgages. That is true factually. The repayment was going to be coming from the mortgages. But that's not, I haven't seen that as a factor in any of the tests that this court has laid out, again, for a century. It just doesn't bear on the question of whether it's debt or equity. And then we talked about, counsel talked about thin capitalization. I have two responses to that. The first is a point I've already touched on, which is the equity cushion wasn't the only protection that was provided by these instruments for the note holders. There's also the excess interest. There was also certain other provisions that we talked about in the brief that ensure that there is that reasonable expectation of repayment present. And the second, maybe even more fundamental, at most, if we're going to be arguing about whether the equity tier was too thin, maybe that would bear on the question of whether the adjacent debt layers should be classified as equity also. The most junior tiers, right, if you think, oh, well, the equity layer is too thin, this next layer also should be treated as equity. The fund was nowhere near the bottom. In fact, the bottom layers, they don't even, the issuers don't even sell them to ERISA plans because they don't want to walk into this gray area. The instruments that the fund acquired were right in the middle of the pack in terms of seniority. And so there was a pretty substantial amount of cushion before any losses would be absorbed by these plans. And so just to sum up, Your Honor, our position essentially is the pension plans have the same rights as any other investors in RMBS trusts. And as this court knows, there has been much litigation by investors in RMBS trusts. But they don't have special protections and special rights just by virtue of being ERISA plans. This theory is simply a misfit here. Thank you, Your Honor. All right. Thank you very much. We'll now hear from Mr. Metlitsky for three minutes. Thank you, Your Honor. May it please the Court, Anton Metlitsky for AQUIN. We, of course, join fully in the argument that Mr. Roth just presented. But there's also an alternative ground for affirmance, which I think Your Honor alluded to, which is that even assuming that the mortgages that AQUIN serviced are plan assets, AQUIN can't possibly be a plan fiduciary, which means neither AQUIN nor Wells Fargo can be held liable. There are really two reasons for that. The second reason we laid out in our brief, loan servicing is a ministerial function, not a fiduciary function. But I would just focus in my short time on the first reason, which is that it's undisputed that AQUIN had no relationship at all with the plan here. It serviced mortgages for the trust, not the ERISA plan. And there's no such thing as a fiduciary by surprise under ERISA. The whole concept of a fiduciary relationship presupposes an actual relationship. It makes no sense to say you're a fiduciary to a stranger, right? A fiduciary has to act solely for the benefit of a beneficiary because of the relationship between the fiduciary and the beneficiary. So, for example, the 11th Circuit has held that a person must have knowledge of his authority or power to control plan assets in order to exercise control over those assets and be a fiduciary. So let me interrupt for just a second. Sure, sure. So what entity would be charged with overseeing AQUIN? And, I mean, I guess AQUIN has gotten in some trouble over time. And to the extent it was misperforming the functions you characterize as ministerial or collecting excessive fees, what entity would have been charged with monitoring that? Oh, many, many entities have, in fact, sued AQUIN. Apart from governmental. So there's the government, the trust. Investors and mortgages can, of course, sue under the servicing agreement because, of course, if AQUIN is really mismanaging these loans, the trusts are themselves. Any investor in the loan would suffer. Borrowers can sue AQUIN. All we're saying is that an ERISA plan can't, right? There's plenty of normal causes of action. So the investor in the trust here would be? Sorry, the trust themselves are the investors in the mortgages. And the trusts have a servicing agreement with AQUIN. If AQUIN violates that servicing agreement by, for example, taking kickbacks or whatever their argument is, then the trusts have a contract cause of action. Borrowers may have a cause of action. So the fund, for example, through NIS could have gone and said, Listen, we feel like something, you know, some monkey business is going on here. We need you to look at how AQUIN is behaving. They could have, although the problem is that as their corporate representatives, they are the named fiduciaries of the plan, and their corporate representative testified that he had never heard of AQUIN until this lawsuit was filed. It just bolsters our whole point. There was no relationship between them at all. There are plenty of ways to enforce servicing agreements and to enforce the extra contractual rules, the many, many, many extra contractual rules that govern loan servicing, and those rules have been enforced. Mr. Mitlitsky, Judge Broderick didn't reach this argument. He didn't, no. And you win if we agree with Mr. Roth. Is there some need for clarity in the law on this issue? Your Honor, we're happy for the court to just ignore everything I've just said and affirm on the ground that the district court adopted. I would just say, though, that the fact that there is no relationship at all between the AQUIN and the ERISA plan just bolsters the point that these aren't plan assets. If there were, there would be a relationship, but the fact that there isn't just sort of confirms the point that Mr. Roth was arguing. But you don't think that there's confusion in the marketplace on this issue? I mean, you seem to be suggesting this is a pretty obvious conclusion. I think it is very clear that if you have no relationship to an ERISA plan, you can't be that plan's fiduciary. Thank you very much. We'll now hear from Mr. Miller for two minutes of rebuttal. Thank you, Your Honor. A party is a fiduciary to a plan to the extent that it exercises control of the plan's assets. That means that it's not a global determination that all securitization is ministerial. It is whether the particular functions, and there's plenty of case law on this. The case, the SREIN case, which is a third circuit case, is probably the most frequently cited. The duty attaches to the particular conduct, and they have to show if they want to claim ministerial, not just that they have a lot of rules, but that the rules require them to do what they did. So if they took a kickback, which they did, then they would have to show that they were required to do that. And, of course, they were not. And the actual grant of authority in the contract documents could not have been broader. They could do anything they thought was desirable and appropriate. Again, as to the plan assets, Form 5500 is not intended to be an interpretation of the plan assets rule. It is intended to be a statement of the assets and liabilities so that the department and the PBGC can decide, can get a judge of their health. It just has a place to say, what are your equity assets? What are your debt assets? And as this court said, it's easy to use terms evocative of debt without thinking about some other analysis because they are debt. They're the debt of homeowners. The GAO, in fact, issued a report and said that there really should be more specification in the Form 5500, the Schedule H, that there should be a breakout under real estate for mortgage-backed securities, specifically for mortgage-backed securities because the current categories did not really fit mortgage-backed securities and a separate breakout for other asset-backed securities. The Department of Labor put out a proposed rule in 2017, a lot of comments were this is just going to make it harder to fill out this form, and they haven't completed that comment yet, that rule yet, for which the GAO has criticized them. But the idea that there was some reliance on that by them is completely without any kind of support. So the judge said, the district court said, that only debt features are rated by the rating agencies. Actually, the rating agencies rate all asset-backed and mortgage-backed securities. They don't engage in some analysis of debt or equity. They just rate all mortgage-backed securities, and it matters because mortgage-backed securities cannot effectively be purchased by plans unless they have an investment-grade rating. There was an enormous lobbying effort by the industry at the end of the Clinton administration, and the final rules was published just after the election, that greatly expanded the ability of pension plans to invest in mortgage-backed securities, and especially- I mean, we haven't ruled on this issue explicitly, but the Northern District of Illinois and Northern District of California, I think, did sort of deal with this issue more directly and seem to disagree with the argument you're making now. Which argument are you talking about, Your Honor? I'm talking your argument that servicers should be treated as fiduciaries and that that function is a fiduciary function. In those cases, the servicers were given very specific instructions, and they followed them. Those were the servicing of whole mortgages, commercial mortgages. All right, but just to cut to the chase, your view is that if you have very specific responsibilities and you follow them, you're not a fiduciary, but if you don't follow them, you are a fiduciary? Right, or if the supposed requirements are-   What's your best case for that, that your fiduciary status turns on whether you follow instructions? Well, again, the Srin case, it's based upon the conduct. Fiduciary duty attaches to the conduct and whether they- Well, Chao V. Day, which is a D.C. Circuit case. A real estate-excuse me, an insurance broker agreed with a plan to provide-to buy insurance for the members of the plan, and instead of sending the premiums on to the insurance company, put it in his pocket and sent fake policies to the members of the plan. And then he argued, well, I might be an embezzler, but I'm not a fiduciary. And the D.C. Circuit said, no, if you exercise the control to pilfer whatever your rules were, whatever the rules that you were supposedly subject to, if you did not follow them, but you pilfered from the plan, you had control. You were a fiduciary. The I.T. Court case, the Ninth Circuit case, also makes the same point. Really, there are a lot of cases to that effect, Your Honor. All right. Well, we've gone over, and we have other things to cover today, but thank you all. We will reserve decision.